# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL QUICK,<br><br>     *Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY,<br><br>     *Defendant*. | Civil Action No. 09-02064 (CKK) |

## MEMORANDUM OPINION
(April 7, 2011)

Plaintiff Michael Quick ("Quick") commenced this action against the National Institute of Standards and Technology ("NIST"), an agency of the United States Department of Commerce, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking the disclosure of the raw data that NIST used in its architectural and engineering modeling of the collapse of the World Trade Center 7 ("WTC 7") building on September 11, 2001. Presently before the Court are NIST's [10] Motion for Summary Judgment and Quick's [13] Cross-Motion for Summary Judgment. Based upon the parties' submissions, the relevant authorities, and the record as a whole, the Court shall grant NIST's Motion for Summary Judgment, deny Quick's Cross-Motion for Summary Judgment, and dismiss this action in its entirety.[1]

---

[1] While the Court renders its decision today on the record as a whole, its consideration has focused on the following documents, listed in chronological order of their filing: Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s [10] Mem."), Docket No. [10]; Decl. of Catherine S. Fletcher ("Fletcher Decl."), Docket No. [10-1]; Def.'s Stmt. of Undisputed Material Facts ("Def.'s Stmt."), Docket No. [10-2]; Pl.'s Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J., and in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s [13] Mem."), Docket No. [13]; Pl.'s Stmt. of Undisputed Material Facts ("Pl.'s Stmt."), Docket No. [13-1]; Decl. of Michael

# I. PRELIMINARY MATTERS

Preliminarily, the Court pauses to make an overarching observation about the nature of Quick's opposition to NIST's Motion for Summary Judgment. The United States District Court for the District of Columbia has supplemented Rule 56 of the Federal Rules of Civil Procedure with Local Civil Rule 7(h)(1), which requires that each party submitting a motion for summary judgment attach a statement of material facts for which that party contends there is no genuine dispute. The party opposing the motion must, in turn, submit a responsive statement enumerating all material facts which the party contends are genuinely disputed. *See* LCvR 7(h)(1). Both the moving party's initial statement and the opposing party's responsive statement must be based on "references to the parts of the record relied on to support the statement."[2] *Id.* This well-reasoned rule "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996). This Court strictly adheres to the dictates of Local Civil Rule 7(h)(1) when resolving motions for summary judgment.

---

Quick, Docket No. [13-2]; Def.'s Consolidated Reply in Further Supp. of its Mot. for Summ. J. and Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Def.'s [16] Mem."), Docket No. [16]; Suppl. Decl. of Catherine S. Fletcher ("2d Fletcher Decl."), Docket No. [16-1]; Def.'s Resp. to Pl.'s Stmt. of Undisputed Material Facts ("Def.'s Resp."), Docket No. [16-2]; Pl.'s Reply Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s [20] Mem."), Docket No. [20]; Suppl. Decl. of Michael Quick, Docket No. [20-1]; Def.'s Surreply in Further Opp'n to Pl.'s Cross-Mot. for Summ. J. ("Def.'s [22] Mem."), Docket No. [22].

[2] In this way, Local Civil Rule 7(h)(1) aligns with the recent amendments to Rule 56 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 56(c)(1) & (3) (requiring parties to "cit[e] to particular parts of materials in the record" and providing that "[t]he court need consider only the cited materials.").

In the instant case, while Quick has submitted a statement of material facts in support of his own Cross-Motion for Summary Judgment, he has failed to file a response to the statement filed by NIST in support of its independent Motion for Summary Judgment. While there may be some factual overlap between the matters discussed in NIST's statement and the matters discussed in Quick's statement, that does not relieve Quick of his burden to come forward with a statement specifically responding to each of NIST's factual allegations in order to best crystallize the disputed issues for the Court. To the extent the Court is unable to discern the extent of Quick's agreement or disagreement with NIST's proffered facts from the contents of his statement, the Court shall, in an exercise of its discretion, assume the uncontroverted facts identified by NIST to be admitted for purposes of resolving the pending motions. However, given that there appears to be surprisingly little disagreement between the parties about the underlying facts, the impact of this conclusion is likely *de minimis.*

## II. BACKGROUND

The National Construction Safety Team Act (the "NCSTA"), 15 U.S.C. § 7301 *et seq.*, authorizes NIST to establish national construction safety teams to investigate "the failure of a building or buildings that has resulted in substantial loss of life or that posed significant potential for substantial loss of life." 15 U.S.C. § 7301(a). Exercising this authority, NIST conducted an investigation into the collapse of the WTC 7 building, a forty-seven-story office building located immediately to the north of the World Trade Center complex, caused by approximately seven hours of fires ignited by debris from the collapse of the North Tower on September 11, 2001.

On November 13, 2008, Quick requested that NIST disclose "a complete '[c]ertified' legitimate copy of the [c]omputer [m]odels [u]sed by NIST to come to the conclusions' [sic] it

3

reached in the [i]nvestigation of the event of September 11, 2001." Def.'s Stmt. ¶ 1; Pl.'s Stmt. ¶ 1. Over the ensuing days, Quick and NIST corresponded in a successful effort to clarify the scope of the request. Def.'s Stmt. ¶ 2; Pl.'s Stmt. ¶ 2. In its final form, Quick's request sought "the 'raw data' of the models regarding the collapse of World Trade Center (WTC) Building 7" found on NIST's public website. Def.'s Stmt. ¶ 2; Pl.'s Stmt. ¶ 2. NIST provided Quick a fee assessment and, on or about February 23, 2009, Quick sent a check to NIST in the amount of $824.98 for search and duplication fees. Pl.'s Stmt. ¶ 6; Def.'s Resp. ¶ 6.

On July 9, 2009, the Director of NIST issued a formal finding pursuant to the NCSTA providing that the public disclosure of certain information gathered by NIST in connection with its investigation into the collapse of the WTC 7 building "might jeopardize public safety." Def.'s Stmt. ¶¶ 7-9. Thereafter, individuals with the requisite technical expertise and familiarity with the raw data responsive to Quick's request carefully reviewed each data file to segregate those covered by the Director's finding from those that were not covered. *Id.* ¶ 10. The task involved sorting through a massive amount of complex data used to simulate the actual physical response of the WTC 7 building on the day in question. Fletcher Decl. ¶ 12.

On November 4, 2009, while NIST's review of the responsive records was ongoing, Quick commenced the instant action. Pl.'s Stmt. ¶ 9; Def.'s Resp. ¶ 9. On or about January 6, 2010, NIST provided its initial response to Quick's request, releasing approximately 19,116 responsive data files. Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 11. On or about April 2, 2010, after discovering a technical error affecting its prior production, NIST supplemented its response to disclose additional responsive data files. Def.'s Stmt. ¶ 4; Pl.'s Stmt. ¶ 13. Overall, NIST produced a total of 25,644 data files responsive to Quick's request and withheld a total of 68,500

4

data files.  Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 13.  NIST invoked FOIA Exemption 3 as the basis for the non-disclosure of all 68,500 data files withheld.  Def.'s Stmt. ¶ 6; Pl.'s Stmt. ¶ 11.

### III.  LEGAL STANDARD

Congress enacted FOIA to introduce transparency into government activities.  *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984).  Congress remained sensitive, however, to the need to achieve balance between this objective and the vulnerability of "legitimate governmental and private interests [that] could be harmed by release of certain types of information."  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992), *cert. denied*, 507 U.S. 984 (1993).  In reviewing motions for summary judgment in this context, the district court must conduct a *de novo* review of the record, 5 U.S.C. § 552(a)(4)(B), which "requires the court to ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure," *Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003) (internal quotation marks omitted).  "Consistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents," *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993), and only after an agency has proven that it has fully discharged its obligations is summary judgment appropriate, *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)).  In ascertaining whether the agency has met its burden, the district court may rely upon agency affidavits or declarations provided they describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). With these principles in mind, the Court turns to the merits of the parties' cross-motions for summary judgment.

## IV. DISCUSSION

Two motions are presently before the Court: NIST's [10] Motion for Summary Judgment and Quick's [13] Cross-Motion for Summary Judgment. Surprisingly, the two motions share little in common. Accordingly, the Court shall begin by explaining why it shall grant NIST's motion, and then turn to explaining why it shall deny Quick's cross-motion. Thereafter, the Court shall address Quick's contention that he is entitled to discovery.

### A.    *NIST's Motion For Summary Judgment*

NIST contends that it is entitled to summary judgment in this action because it conducted a reasonable search for records responsive to Quick's request; produced all disclosable records responsive to that request, including all reasonably segregable portions thereof; and properly withheld the remaining records pursuant to FOIA Exemption 3. *See* Def.'s [10] Mem. at 10-15. Although styled as such, Quick's "opposition" memorandum contests none of this, but is instead confined to Quick's independent contention that he should be designated as the prevailing party in this action because he secured the production of records responsive to his request. *See generally* Pl.'s [13] Mem. Indeed, Quick expressly and repeatedly argues that "the filing of his civil action caused the agency to provide [him] with responsive records" and that he has now received "all non-exempt responsive records." Pl.'s [20] Mem. at 1-2. He never suggests—let

6

alone establishes through legal argument and adequate record support—that NIST's search, production, or withholding decisions were in any way defective or otherwise fell short of the applicable legal standards. *See generally* Pl.'s [13] Mem. In this Circuit, "it is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003), *aff'd*, 98 F. App'x 8 (D.C. Cir. 2004); *accord Lewis v. District of Columbia*, 2011 WL 321711, at *1 (D.C. Cir. Feb. 2, 2011). Because Quick has completely failed to contest NIST's arguments that it conducted a reasonable search for records, produced all disclosable records, and properly withheld responsive records, the Court shall treat those arguments as conceded. Regardless, as described below, the record supports NIST's position.

First, NIST has submitted a detailed declaration describing the contours of its search for the raw data used to prepare the architectural and engineering models simulating the collapse of the WTC 7 building. *See* Fletcher Decl. ¶¶ 7-88. That search included consulting with experts in NIST's Building and Fire Research Laboratory (the "BFRL")—the agency component responsible for performing the modeling in question and the area most likely to maintain records responsive to Quick's request—and, as a result of its efforts, NIST ultimately located the exact data files it set out to locate. *Id.* ¶¶ 7-14, 28-30. Under these circumstances, NIST has shown that it made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

Second, NIST has provided ample support for its contention that its decision to withhold

68,500 data files involved a straightforward application of FOIA Exemption 3, which permits an agency to withhold information "specifically exempted from disclosure by statute . . . if that statute . . . refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(ii). Of particular relevance here, the NCSTA expressly precludes NIST from "publicly releas[ing] any information it receives in the course of an investigation . . . if the Director finds that the disclosure of that information might jeopardize public safety." 15 U.S.C. § 7306(d). In conformity with this provision, the Director of NIST made an express finding that the public disclosure of certain types of information pertaining to the architectural and engineering modeling of the collapse of the WTC 7 building might jeopardize public safety—generally speaking, detailed connection models, connection material properties, and break element strips that had been validated against actual events. Fletcher Decl. ¶¶ 17-18, 22 & Ex. 4. Reduced to layman's terms, the difference between the information that was released and the information that was withheld is that the released data files contain structural models based on information generally available to building designers and engineers, whereas the withheld data files contain information that could be used to predict the collapse of a building and, if made available to a person with the appropriate level of expertise, would provide instruction to individuals wanting to learn how to simulate building collapses and how to most effectively destroy large buildings. *Id.* ¶ 22. As contemplated by the statutory scheme created by Congress, the Director of NIST brought his expertise to bear on the subject and determined that the public disclosure of such information "might jeopardize public safety," 15 U.S.C. § 7306(d), and should be withheld. This explanation for non-disclosure is sufficiently "logical" or "plausible" to satisfy NIST's burden of justifying its withholdings, *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009), and

NIST has, moreover, explained in a "relatively detailed" manner why the exemption is relevant in this context and has appropriately correlated the exemption with the pertinent records, *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006). In short, NIST has provided an adequate explanation of, and justification for, its withholding decisions.

Third, and finally, NIST's sworn declarations describe how, after conducting an extensive interrogation of the data files responsive to Quick's request, it has carefully reviewed and released all reasonably segregable information. Ultimately, NIST released a total of 25,644 data files and withheld another 68,500. Fletcher Decl. ¶ 26. NIST has produced a *Vaughn* index[3] dividing the data files into their organizational and functional case folders and setting forth the following information for each responsive case folder: a description of the analysis to which the data files in the case folder relate; the portions of the investigation reports to which the data files in the case folder relate; a description of each category of withheld data files in the case folder; the precise number of data files for each category of withheld files; and a segregability analysis for each case folder. *Id.* ¶¶ 28-88. As the United States Court of Appeals for the District of Columbia Circuit has observed, the question of segregability is by necessity subjective and context-specific, turning upon the nature of the records in question and the information contained therein. *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977). In this case, particularly when taking into account the sheer scope of the data captured by Quick's request, NIST's submissions are a perfect illustration of how abstraction and categorical

---

[3] In *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), the United States Court of Appeals for the District of Columbia Circuit provided that agencies should generally prepare an itemized index correlating each withheld document, or portion thereof, with a specific exemption and the agency's justification for non-disclosure.

treatment, used properly, may assist the district court in evaluating an agency's withholding decisions. *Judicial Watch*, 449 F.3d at 147; *see also Budik v. Dep't of Army*, 742 F. Supp. 2d 20, 37 (D.D.C. 2010) ("[A]n agency is not precluded from grouping categories of documents that merit similar treatment."). In this case, NIST has provided a reasonably detailed explanation to support its claim that all non-exempt, responsive information has been produced.

In the final analysis, NIST conducted a reasonable search for records responsive to Quick's request; produced all disclosable records responsive to that request, including all reasonably segregable portions thereof; and properly withheld the remaining records pursuant to FOIA Exemption 3. Therefore, and because Quick has conceded the merits of NIST's arguments in this regard, the Court shall grant NIST's [10] Motion for Summary Judgment in its entirety.

**B.     *Quick's Cross-Motion For Summary Judgment***

The basis for Quick's Cross-Motion for Summary Judgment is not easy to define; he has repeatedly shifted his position and redefined his arguments with each successive filing, effectively presenting both this Court and NIST with a moving target. Indeed, the contours of Quick's arguments are not fully revealed until his reply. The variable nature of Quick's position appears to be the result of his efforts to adapt and correct his arguments—which are premised on an incorrect understanding of both the relevant facts and the applicable legal standard—once one avenue for relief has been all but foreclosed by NIST's responsive briefing.

**1.     Quick's Argument That He Has "Substantially Prevailed" In This Action By Securing The Production Of Records Is Without Merit**

In his opening memorandum, Quick tendered a single argument in support of his Cross-Motion for Summary Judgment—namely, that he should be deemed to have "substantially prevailed" in this action because NIST produced records responsive to his request after the

commencement of the instant action.  Pl.'s [13] Mem. at 9-10.  In support of that position, Quick

cited two authorities.  The first was the provision from FOIA addressing when a district court

may "assess against the United States reasonable attorney fees and other litigation costs incurred

in any case . . . in which the complainant has substantially prevailed."  5 U.S.C. § 552(a)(4)(E)(i).

The second was an opinion from the United States Court of Appeals for the Ninth Circuit

addressing that same provision.  *See Oregon Natural Desert Ass'n v. Locke*, 572 F.3d 610, 614-

15 (9th Cir. 2009).  Quite reasonably, NIST construed Quick's opening memorandum as

tantamount to a premature petition for attorneys' fees, and tailored its arguments accordingly.

*See* Def.'s [16] Mem.  Pivoting, Quick responded that NIST "clearly misconstrued [his] request

for declaratory relief in this action," conceded that he "fully concurs . . . that it is entirely

premature for the parties to address any attorney fee recovery issues at this time," and then

proceeded to set forth an entirely new argument that NIST has engaged in an unlawful "pattern or

practice" of delay in responding to FOIA requests concerning its investigation into the events that

transpired at the World Trade Center on September 11, 2001.  Pl.'s [20] Mem. at 1-2, 9.

Quick's suggestion that NIST simply misunderstood his "pattern or practice" argument is

entirely disingenuous; the Court agrees that the only reasonable reading of Quick's opening

memorandum is as a premature petition for attorneys' fees or an attempt to set the stage for such

a petition.  While Quick may have alleged that NIST failed to "wake up" and process his request

until after he commenced the instant action, completely absent from Quick's opening

memorandum is any suggestion—let alone factual and legal support—for his newly tendered

argument that NIST has engaged in a broader "pattern or practice" of delay in responding to

requests generally.  *See* Pl.'s [13] Mem.  Indeed, the premises of the two arguments are, if not

fundamentally irreconcilable, in considerable tension. On the one hand, Quick argued in his opening memorandum that he had successfully secured "a voluntary or unilateral change in [NIST's] position," *id.* at 10—in other words, he argued that he had already obtained the desired outcome. On the other hand, in support of his "pattern or practice" argument, Quick argues in his reply memorandum that NIST is engaging in an ongoing practice of failing to "provide a final response or responsive records to a FOIA requester absent the filing of a federal court FOIA action," and that he requires a declaration and injunction to prevent NIST from engaging in the alleged practice "in the future." Pl.'s [20] Mem. at 7.

The Court shall not belabor the point: it is clear from Quick's opening memorandum that the sole basis for his Cross-Motion for Summary Judgment is that he should be deemed to have "substantially prevailed" in this action because NIST produced records responsive to his request after the commencement of the instant action. Pl.'s [13] Mem. at 9-10. Because this is a question that goes to his entitlement to attorneys' fees, and because Quick has since conceded that it is premature for the parties to address the recovery of attorneys' fees at this time, the Court shall deny Quick's [13] Cross-Motion for Summary Judgment on this basis alone.

### 2. Quick's Untimely Argument That NIST Has Engaged In A "Pattern Or Practice" Of Delay Is Without Merit

Even if the Court were to consider Quick's belatedly tendered argument, offered for the first time in his reply papers, that he is entitled to summary judgment because NIST has "an unlawful patten [sic] and practice" of producing records only after a requester takes the step of commencing a lawsuit, Pl.'s [20] Mem. at 2-3, the same result would obtain. For at least two reasons, the argument is without merit.

### i. No "pattern or practice" claim appears in Quick's Complaint in this action.

First, the argument fails at the outset for the simple reason that nothing even remotely resembling a "pattern or practice" claim appears within the four corners of Quick's Complaint. The Complaint includes a single cause of action—namely, that NIST "fail[ed] to provide [Quick] with all responsive non-exempt records . . . requested by [him] in his FOIA request of November 13, 2008." Compl., Docket No. [1], ¶ 19. In connection with that cause of action, Quick sought a decidedly narrow declaration that NIST "violated FOIA by failing to provide all non-exempt records responsive to [his] November 13, 2008 FOIA request" and a correspondingly narrow order directing NIST to "immediately provide [him] with all non-exempt records responsive to [his] November 13, 2008 request." Compl. at 7. Even viewing his Complaint in a generous light, there simply is no indication—none—that Quick's narrow claim extended beyond the discrete confines of his specific request for records to encompass a broader "pattern or practice" challenge.

Meanwhile, in the nearly seven months that have passed since NIST first argued that Quick's Cross-Motion for Summary Judgment cannot rest on a "pattern or practice" claim because no such claim appears in the Complaint, *see* Def.'s [22] Mem. at 3, Quick has never sought leave to amend his Complaint to add such a claim. To the extent Quick considers his belated argument proffered in his reply memorandum sufficient, he is mistaken; it is axiomatic that a party cannot amend its complaint merely by injecting new claims in the course of briefing a dispositive motion. *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003).

In short, Quick's allegations concerning an alleged "pattern or practice" in the way NIST

handles FOIA requests are not material to any claim before the Court. Based on Quick's explicit

concession that he has received "all non-exempt responsive records" pertaining to his request,

Pl.'s [20] Mem. at 1-2, his only claim in this action is now moot and the associated relief

unavailable. *See Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982) ("[H]owever fitful or

delayed the release of information under the FOIA may be, once all requested records are

surrendered, federal courts have no further statutory function to perform."); *accord Tunchez v.*

*U.S. Dep't of Justice*, 2011 WL 1113423, at *1 (D.C. Cir. Mar. 14, 2011) (per curiam).

Therefore, the Court shall deny Quick's [13] Cross-Motion for Summary Judgment on this

separate, independent basis.

### ii. Quick lacks standing to pursue a "pattern or practice" claim in this action.

Second, even if Quick had hypothetically asserted a plausible "pattern or practice" claim

in his Complaint, he would nevertheless lack standing to pursue such a claim in this action. Even

assuming, *arguendo*, that individuals others than Quick may have been subject to a "pattern or

practice" of delay in NIST's processing of requests, the record is clear that Quick was not himself

subject to such a pattern or practice.[4]

It is undisputed that upon receiving Quick's initial correspondence on November 13,

2008, NIST promptly reached out to Quick in a successful effort to clarify the scope of the

request. Fletcher Decl. Exs. 1-2; 2d Fletcher Decl. ¶¶ 6-7. Within a week, Quick and NIST had

engaged in an extended dialogue concerning the scope of the request, personnel within NIST's

---

[4] In light of this conclusion, the Court need not consider whether there is any merit to Quick's contention that a "pattern or practice" of delay on NIST's part may be evidenced by "three entirely independent circumstances" of delay. Pl.'s [20] Mem. at 6-7.

FOIA office had conferred with personnel within the BFRL to ascertain whether Quick's request was sufficiently tailored to allow for further processing, NIST had informed Quick of the practical problems flowing from the unique formatting of the data files requested, and NIST sent Quick an acknowledgment letter delineating the scope of his final request. Fletcher Decl. Ex. 2; 2d Fletcher Decl. ¶¶ 7-11. Within two weeks, personnel within NIST's FOIA office had identified additional technical issues arising from the scope of Quick's request, obtained technical clarifications from Quick concerning those issues, and discussed the physical format of any potential release. Fletcher Decl. Ex. 2.H; 2d Fletcher Decl. ¶¶ 14, 16. By December 18, 2008, NIST provided Quick with an update as to the logistics involved in processing and reviewing his requests, including its concern that the size of data, then estimated to exceed two terabytes, would span hundreds of compact discs and would likely require any physical production to take the form of a hard drive. 2d Fletcher Decl. ¶ 17. Quick was informed that NIST would prepare a fee assessment estimate, and NIST began processing the estimate internally that same day. *Id.*

On January 9, 2009, following a series of internal discussions and approvals, NIST sent Quick a final fee assessment estimate, advising Quick that he had thirty days to remit payment. Fletcher Decl. Ex. 2.J; 2d Fletcher Decl. ¶¶ 18-22. Rather than immediately remitting payment to expedite the processing of his request, Quick elected, as was his right, to wait until the week prior to the expiration of the thirty-day period to request a thirty-day extension of time. Fletcher Decl. Ex. 2.K; 2d Fletcher Decl. ¶ 23. Quick's request was granted, and Quick ultimately submitted payment in the amount of $824.98 on or about February 23, 2009, approximately a month-and-a-half after he was first issued the fee assessment. Fletcher Decl. Ex. 2.K; 2d

Fletcher Decl. ¶¶ 23-24; Pl.'s Stmt. ¶ 6; Def.'s Resp. ¶ 6. Significantly, the regulations governing NIST's processing of FOIA requests expressly provide that "[i]f the component has notified a requester that the actual or estimated fee is more than $20.00, the component shall not consider the request received for purposes of calculating the time limit . . . to respond to a request, or process it further, until the requester agrees to pay the anticipated total fee." 15 C.F.R. § 4.11(e). As a result, the clock did not even begin to run in this case until on or about February 23, 2009, when Quick sent in payment for the requisite processing fee.[5] The very next day, the BFRL was instructed to begin its processing efforts in earnest. 2d Fletcher Decl. ¶ 28.

In this case, the task of locating, reviewing, and producing records responsive to Quick's request was not an easy one: it began with an exhaustive search for responsive files; proceeded to the organization and interrogation of the 94,144 potentially responsive data files located; and involved a deep, two-tier review of each individual data file to ascertain its contents and its role within the complex and specialized architectural and engineering models developed by NIST. 2d Fletcher Decl. ¶¶ 29-32. By July 2009, approximately four months before Quick commenced the instant action, NIST had already provisionally segregated responsive from non-responsive data files and had developed a general understanding of the contents and roles of individual data files within the larger models. *Id.* ¶ 33.

---

[5] The Court observes that the record in this case includes an e-mail from Quick to NIST, dated February 13, 2009, ten days before Quick actually paid the anticipated fee, wherein Quick writes that "[t]he Citizens of the United States of America have accomplished the goal of $825.00 $US [sic] with a healthy surplus, which will be decided on at a later date" and "request[s] the funds go to the firemen and police victims fund for 911." Fletcher Decl. Ex. 2.M. Even assuming that Quick's e-mail would satisfy the requirement that the requester "agree[] to pay the anticipated total fee" in a "memorialized [] writing," 15 C.F.R. § 4.11(e), the difference between the date of the e-mail and the date Quick actually paid the requisite processing fee would not alter the Court's conclusion.

Concurrently with its responsiveness review, a separate process was underway to determine, as required by the terms of the NCSTA, whether the public disclosure of any of the information covered by Quick's request might pose a risk to public safety. 2d Fletcher Decl. ¶ 34. On July 9, 2009, following a series of internal discussions, the Director of NIST completed his review and issued his formal finding identifying categories of information exempted from disclosure, which then allowed personnel within the BFRL to conduct a deep dive into the data files to segregate the data files that were exempt from release from those that were not exempt from release. Def.'s Stmt. ¶¶ 7-9; 2d Fletcher Decl. ¶ 39. Significantly, given the scope and complexity of the data involved, particularly the complex relationships between data, individuals with the requisite technical expertise and familiarity with the raw data were required to individually review the 91,114 potentially responsive data files, sharply curtailing the number of competent staff available to participate. Def.'s Stmt. ¶ 10; Fletcher Decl. ¶ 15; 2d Fletcher Decl. ¶ 40.

The scope of the data involved, meanwhile, was extensive. Simply by way of example, one of the models developed by NIST in the course of its investigation, designed to capture the response of the entire WTC 7 building to the initial failure event, consisted of 3,045,925 distinct elements with 3,593,049 nodes. Fletcher Decl. ¶ 14. A second model, referred to colloquially as the "sixteen-story model," was designed to simulate the structural response to elevated temperatures of the lower sixteen stories of the building, where the fires grew and spread, causing a series of local structural failures in the building's floor systems. Id. ¶ 13. The model contained 101,357 distinct elements with 93,413 nodes, with each element associated with a significant amount of data, id., pertaining to such factors as nonlinear geometric effects, gravity

load, temperature-time histories, thermal expansion, material stress-strain behavior, bolt failure, etc., *see* Fed. Bldg. & Fire Safety Investigation of the World Trade Ctr. Disaster: Structural Resp. & Probable Collapse Sequence of World Trade Ctr. Bldg. 7, NIST NCSTAR 1-9, at 458-89.

NIST completed its first-round review process on September 5, 2009, almost a month before Quick commenced the instant action, at which point the files were forwarded to the BFRL's Deputy Director for a second level of review designed to ensure that information that might pose a risk to public safety if made publicly available would not be disclosed in violation of Congress' command in the NCSTA. 2d Fletcher Decl. ¶¶ 41-44. The individual charged with the task, who had the institutional competence and technical expertise to conduct the review, was personally involved in processing approximately fifty other independent FOIA requests at the time. *Id.* ¶ 43. On November 4, 2009, while NIST's second-round review was ongoing, Quick commenced the present action. Pl.'s Stmt. ¶ 9; Def.'s Resp. ¶ 9. NIST completed its review shortly thereafter, on November 9, 2009, and released responsive records to Quick on January 6, 2010 and April 2, 2010. Def.'s Stmt. ¶¶ 3-4; Pl.'s Stmt. ¶¶ 11, 13; 2d Fletcher Decl. ¶ 46. Overall, NIST produced a total of 25,644 data files responsive to Quick's request and withheld a total of 68,500 data files. Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 13.

True, NIST did not issue a final response to Quick's request within the twenty-working-day default period designated by FOIA, *see* 5 U.S.C. § 552(c)(6)(A)(i), an unremarkable occurrence given the nature of Quick's request. The staggering scope and complexity of the data captured within the ambit of Quick's request, and the specialized expertise required to process and produce that data, almost certainly presented the sort of "exceptional circumstances" that would warrant a departure from the twenty-day default, and it is clear from the record that NIST

18

continued to "exercis[e] due diligence in responding to the request" from the time it was deemed received to the time it completed its production.  *Id.* § 552(c)(6)(C)(i).  The Court, however, need not reach that precise question.  The factual underpinning of Quick's "pattern or practice" claim is that there is "no evidence" that NIST acted diligently in processing his request until he filed the instant action, on November 3, 2009.  Pl.'s [20] Mem. at 3.  Quite the contrary, everything in the record evidences that NIST promptly responded to Quick upon initial receipt of his request, almost immediately began the internal process to evaluate its ability to respond to the request, engaged in an extended dialogue with Quick in order to define the precise contours of his request, and made consistent and diligent efforts to locate, review, and produce the massive amount of complex data responsive to Quick's request while balancing its statutory obligation to withhold information that might pose a risk to public safety if disclosed.  Indeed, Quick concedes, as he must, that the sworn declarations submitted by NIST "suggest[] . . . that the agency was allegedly taking various action[s] to process" his request.  Pl.'s [20] Mem. at 4.  While Quick may personally "dispute[] those assertions," *id.*, it is well-established that "[a]gency affidavits are accorded a presumption of good faith" in this context and cannot be rebutted by speculation of the sort proffered by Quick in this case.  *SafeCard Servs., Inc. v. Secs. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

Based on this record, even if the Court were to consider Quick's belatedly tendered argument that NIST has "an unlawful patten [sic] and practice" of producing records only after a requester takes the step of commencing a lawsuit, Pl.'s [20] Mem. at 2-3, there can be no genuine dispute that NIST began processing Quick's request long before the commencement of the instant action and consistently and diligently worked towards completing that request in the

absence of litigation.  Therefore, even assuming that individuals other than Quick may have been subject to the alleged "pattern or practice," the record is clear that Quick was not.  That being the case, Quick lacks standing to pursue such a claim in this action.  *Cf. Giacobbi v. Biermann*, 780 F. Supp. 33, 40-41 (D.D.C. 1992) (plaintiff lacked standing to assert that agency engaged in a "pattern and practice of failing to meet its statutory obligation to investigate and act on complaints in a prompt manner" where plaintiff's case was investigated; plaintiff was "not an appropriate party to raise a pattern of failure to investigate, even if such a pattern were to exist."), *aff'd*, 1992 WL 309042 (D.C. Cir. Oct. 16, 1992) (per curiam); *see also Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, 30-31 (D.D.C. 2004) (plaintiffs' "policy or practice" claim relating to late FOIA responses was untenable where plaintiffs' requests were extremely broad and onerous and plaintiffs offered no rebuttal to the agency's explanation for the delay).  Meanwhile, to the extent Quick seeks to establish his standing to pursue his "pattern or practice" claim by his passing allegation that he "plans to file additional FOIA requests to the NIST in the future," the Supreme Court has foreclosed that route: "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the [requisite] 'actual or imminent' injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) (emphasis in original); *see also Worth v. Jackson*, 451 F.3d 854, 858 (D.C. Cir. 2006).  Therefore, the Court shall deny Quick's [13] Cross-Motion for Summary Judgment on this separate, independent basis.

## C.    *Quick Is Not Entitled To Discovery In This Action*

On August 5, 2010, this Court denied without prejudice Quick's request that a briefing schedule be entered to address the question of whether Quick was entitled to discovery,

concluding that Quick's "requests for discovery were made only after the parties' cross-motions for summary judgment had been filed" and "[n]o formal request for discovery pursuant to Federal Rule of Civil Procedure 56(f)[6] ha[d] been made." Min. Order (Aug. 5, 2010). Quick suggests that the Court should "reconsider" its prior order, contending that he should be allowed to conduct "limited discovery" as to whether NIST was actually taking action in processing his request prior to the filing of this action. Pl.'s [20] Mem. at 4-5. For at least two reasons, Quick is not entitled to such discovery.

First, Quick still has not made a formal showing, by affidavit or declaration, that he "cannot present facts essential to justify [his] opposition." Fed. R. Civ. P. 56(d). For one thing, Quick never identifies precisely what information he would seek or what evidence he hopes to discover; his generalized, speculative request "falls short of what the rule requires." *Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 35 (D.D.C. 2010). For another, the rule requires the party to establish that the evidence sought is essential to his opposition, and given the alternative bases for the Court's decision, Quick fails to articulate how his speculative discovery requests "would alter the [C]ourt's determination." *Cheyenne Arapaho Tribes of Oklahoma v. United States*, 558 F.3d 592, 596 (D.C. Cir. 2009).

Second, where, as here, the agency's declarations are sufficiently detailed and the district court is satisfied that no factual dispute remains, discovery should be denied. *Wolf v. Cent. Intelligence Agency*, 569 F .Supp. 2d 1, 9-10 (D.D.C. 2008). Because Quick has failed to raise substantial or even colorable doubt concerning the adequacy or good faith of NIST's response to

---

[6] With the recent amendments to the Federal Rules of Civil Procedure, the provision now appears in substantially the same form as Fed. R. Civ. P. 56(d).

his request, he has failed to establish his entitlement to discovery. *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003).

## V. CONCLUSION

For the reasons set forth above, the Court shall grant NIST's [10] Motion for Summary Judgment, deny Quick's [13] Cross-Motion for Summary Judgment, and dismiss this action in its entirety. An appropriate Order accompanies this Memorandum Opinion.


Date: April 7, 2011


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge